MITZI L. WHITE,               )
                             )
            Plaintiff,        )
                             )
      vs.                     )          No. 4:05-CV-932 (CEJ)
                             )
JO ANNE B. BARNHART,          )
Commissioner of Social        )
Security,                     )
                             )
            Defendant.        )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.  Procedural History

On May 13, 2003, plaintiff Mitzi L. White filed an application for a period of disability and disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., claiming that she had been unable to work since October 21, 2002, when she was in a motor vehicle accident. (Tr. 61, 14). Plaintiff alleged disability based on herniated discs. (Tr. 96). After plaintiff's application was denied on initial consideration, she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 51-54, 49).

The hearing was held on September 8, 2004. Plaintiff was represented by counsel. (Tr. 280-307). The ALJ issued a decision on October 21, 2004, denying plaintiff's claim. (Tr. 10-24). The Appeals Council denied plaintiff's request for review on May 6, 2005. (Tr. 3-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

Plaintiff was the sole witness at the September 8, 2004 hearing. She testified that she was 39 years old, married, and resided with her husband and two sons, ages 18 and 12. (Tr. 283-84, 306). She completed 12 grades of education and she is able to read, write and keep a checkbook. (Tr. 284, 301).

At the time of her injury, plaintiff was employed as a school bus driver. On October 21, 2002, plaintiff was driving her bus route when the bus was hit head-on by another vehicle traveling on the wrong side of the road. (Tr. 285). Plaintiff was traveling at a speed of approximately five miles per hour and the speed of the oncoming vehicle was approximately 25 miles per hour. (Tr. 264). Plaintiff was treated for injuries to her back, neck, shoulders, and right knee. She received worker's compensation payments for the months of November 2002 through April 2003. (Tr. 285).

Following the collision, plaintiff experienced knee pain and numbness and she had to use crutches. (Tr. 287). On October 17, 2003, she underwent arthroscopic surgery on her knee to repair a torn meniscus. (Tr. 286, 288, 270). She was also diagnosed with cervical syndrome with aggravation of degenerative disc disease, thoracic strain with aggravation of disease, lumbar syndrome secondary to mild bulges, and moderate myofascial[1] pain syndrome. (Tr. 290).

Plaintiff testified that she had problems from the base of her skull to her tail bone. (Tr. 286). She experienced pain from the

------

[1]Of or relating to the fascia surrounding and separating muscle tissue. See Stedman's Med. Dict. 1173 (27th ed. 2000).

-2-

base of her neck to the middle of her back. She said she experienced daily muscle spasms along the entire right side of her spine and stated that her back sometimes "pinche[d] or "lock[ed] up." She stated she had a pinched nerve in the lower right back. (Tr. 291-92). She described her pain as severe, and placed it at nine on a ten-point scale during the hearing. (Tr. 293, 301). The pain interfered with her ability to concentrate. (Tr. 303-04). She could not identify anything that brought the pain on, or made it worse; it was just always there. (Tr. 301-02). When asked what medication she took for pain, plaintiff listed Ibuprofen, Advil, and Tylenol. She previously took Vicodin[2] and Percocet[3], but that ceased on May 1, 2003, when she was determined to have reached maximum improvement. (Tr. 293). Later, plaintiff testified that she did not take prescription medication because, "There's no doctor will see me for this because it's a workman's comp case so they won't treat me." (Tr. 304).

Plaintiff testified that she could hardly get out of bed some mornings. She could not sit for very long and she had to switch positions every five minutes. (Tr. 293). She testified that she lay down once or twice an hour, for about ten minutes each time. (Tr. 295). She testified that she did not sleep well at night

---

[2]Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain. Dependence or tolerance may occur. See Phys. Desk. Ref. 530-31 (60th ed. 2006).

[3]Percocet is a combination of Oxycodone and Acetaminophen. Ocycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain. It can produce drug dependence. See Phys. Desk. Ref. 114 (60th ed. 2006).

because it was hard to find a comfortable position. (Tr. 304-05).
When asked how much weight she could lift, plaintiff answered that she could cradle a sack of potatoes. (Tr. 296). She and her children prepared meals and she was able to do laundry. (Tr. 296). Her children loaded the dishwasher and, along with their father, they also did the vacuuming and sweeping. (Tr. 296-97). Plaintiff estimated that she could walk about half of one block. She only had to climb three stairs at home. (Tr. 298). She tried not to bend or kneel and she used a "grabber" device to pick things up. (Tr. 298-99). She was able to dress and bathe herself and could drive a car, although she stated that driving to the hearing was difficult. (Tr. 297). She rarely drove for longer than fifteen minutes at a time. She took a one hour, twenty minute flight to Oklahoma to see a new grandchild on March 22, 2003, cancelling a physical therapy appointment in order to do so. (Tr. 299-301). She was taking prescription pain medication at the time. (Tr. 304). She testified at the hearing that she was no longer able to go bowling, play bingo, or attend flea markets. (Tr. 305).

Plaintiff had previously worked as a waitress and as a "checker" at a grocery store. (Tr. 284, 302). She could not return to work as a checker because she would have to use her right arm and stand for several hours. (Tr. 303). She worked one day as a school bus monitor but the "jarring and bouncing" caused her so much pain that she later had to go to the emergency room. (Tr. 294-95).

On June 21, 2003, plaintiff completed the Claimant Questionnaire as part of her initial application. (Tr. 69-72). She described her symptoms as pain that became worse if she "move[d] around too much." She described the pain as constant, "all the time 24 hours a day 7 days a week." She stated that immediately after the accident she had needed help getting to the bathroom and could "hardly get out of bed without help." Lying in hot water provided temporary relief. When asked to list her medications, she wrote, "I am out of all my medicines [and] can't go to a doctor yet." When she had medication, she stated, she took it without side effects. She wrote that she did not get "very much sleep at all," usually three to four hours per night and, if "lucky," slept for four to six hours. She no longer cooked or did housework, with the exception of dusting. She relied on her oldest son to go grocery shopping and to cook and both children helped with cleaning. She did not go to the store often and could not walk very far. Her daily activities included watching television and reading the newspaper. She could no longer do any activities or hobbies and relied on her family to take care of her.

Plaintiff also completed a Pain Questionnaire. (Tr. 73). She described the pain as "constant," and said her back and neck "ache, throb and [experience] sharp pains all day 24 hours a day." She also described a "pinching pain" in her back. She wrote that she "hurt from [her] head alway [sic] down to my back & it goes into my legs." Bending, squatting, standing or sitting all caused extreme pain. She could sit or stand for no more than fifteen minutes at

a time, and she alternated between them.  In response to a question regarding what relieved the pain, plaintiff wrote that she took Percocet three to five times a day, when available, and went to the emergency room for a shot of morphine two or three times per month.

In completing the form entitled "Claimant's Statement when Request for Hearing is Filed and the Issue is Disability," plaintiff indicated that she was taking Zocor[4] and Prozac.[5]  (Tr. 67-68).  She also stated that she had received inpatient treatment for "pain killer addiction" from August 15, 2003, to August 17, 2003.  (Tr. 68).

Plaintiff's work-history self-report indicates that she worked as a school bus driver, a grocery store checker, and a waitress.

### III.  Medical Evidence

Plaintiff was seen at the emergency room at the St. Joseph Health Center on October 21, 2002.  She complained of pain or discomfort in her neck, shoulders, and mid- to lower back.  (Tr. 221).  X-rays of her thoracic spine found no evidence of dislocation or fracture.  (Tr. 224).  She was diagnosed with cervical-dorsal strain and was discharged with restrictions on

---

[4]Zocor is a lipid-lowering drug prescribed to treat high cholesterol.  See Phys. Desk. Ref. 1921 (53rd ed. 1999).

[5]Prozac is a psychotropic drug indicated for treatment of, inter alia, major depressive disorder.  See Phys. Desk. Ref. 1772-72 (60th ed. 2006).

lifting for three days. She was prescribed Naprosyn,[6] Norflex,[7] and Vicodin and given a follow-up appointment. (Tr. 219).

Plaintiff received treatment from Unity Corporate Health at St. John's Urgent Care Center from October 23, 2002 through November 25, 2002. (Tr. 127-40). On October 23, 2002, she presented with pain of the left neck, thoracic spine, and lumbosacral muscles. (Tr. 137). She had decreased range of motion in the neck and left shoulder secondary to pain, decreased abduction of the shoulder and arm secondary to pain, positive straight leg raising secondary to pain, and positive paresthesia to the right hand. She was prescribed Naprosyn, Skelaxin,[8] and Vicodin, and placed on "modified duty" through November 1, 2002.

Plaintiff was seen again for an unscheduled visit on October 28, 2002. (Tr. 144-45, 148-50). She complained of persistent pain in the right neck, shoulder and knee. On examination, she was found to have tenderness over the right paravertebral muscles of the cervical spine with radiation to the trapezius muscle, and pain over the right shoulder with motion. X-rays of the cervical spine and right knee showed no fractures. She was referred to physical

---

[6]Naprosyn is a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management. See Phys. Desk Ref. 2769-70 (60th ed. 2006).

[7]Norflex is an injectable drug indicated as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute painful musculoskeletal conditions. See Phys. Desk. Ref. 1824 (60th ed. 1824).

[8]Skelaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute musculoskeletal conditions. See Phys. Desk Ref. 1685 (60th ed. 2006).

therapy and placed on light duty, with prescriptions for Ibuprofen and Ultracet[9].

At a scheduled follow-up on November 4, 2002, plaintiff still had pain in the right neck and back. (Tr. 133-35). Her knee was better, although she reported that her first session of physical therapy had initially made it worse. She was diagnosed with right neck and back strain and continued on medications, physical therapy, and light duty. On November 18, 2002, plaintiff continued to complain of pain and spasm on the right side. (Tr. 131-32). She received approval for an extra week of physical therapy. Two weeks later, she reported no improvement at all. (Tr. 128). On examination, she had tenderness on the right side of the neck through the lumbar region. She was observed with mild spasm and increased pain with movement. A recommendation was made that she be referred to a back specialist or orthopedist.

Plaintiff was seen at PRO Rehab for nine sessions of physical therapy between November 1, 2002 and November 22, 2002. (Tr. 106-26). At her first visit, plaintiff rated her pain in the cervical and lumbar region as a constant seven on a ten-point scale, escalating to a throbbing pain rated at ten. (Tr. 124). She reported that she had experienced frequent headaches since the accident. Her prior activities were increasingly difficult due to pain. A progress report dated November 13, 2002, noted that

_____

[9]Ultracet is indicated for the short term (five days or less) management of acute pain. See Phys. Desk Ref. 1462-63 (60th ed. 2006).

plaintiff reported no significant improvement after six sessions of physical therapy. Her self-reports of pain remained quite high. Under "Assessment," it was noted that plaintiff "perceives herself as totally disabled . . . but is able to independently drive herself to the clinic and complete the necessary exercise program. . . . She reports no significant change in her condition and states she doesn't feel ready to return to work. Overall, Mitzi continues to demonstrate [range of motion]/strength deficits with inconsistencies present between her subjective complaints and objective findings." (Tr. 116). On November 22, 2002, after three additional sessions, it was noted that plaintiff reported slight improvement, although her scores on rating instruments remained unchanged. The therapist reported that plaintiff "continues to ambulate and transfer with increased ease but reports no change in her condition. She demonstrates ability to lift weights during seated rows and completes all stretching activities with minimal complaints that do not reflect her self-perception indicated by subjective questionnaire. Objectively, she continues to demonstrate 4/5 positive Waddell's signs[10] on a consistent basis. Overall, slight improvements are noted, but inconsistencies remain present between subjective and objective data." (Tr. 107-08).

---

[10]Waddell's signs are a group of physical signs in patients with low back pain. They are thought to be indicators of a nonorganic or psychological component to pain. The presence of three or more signs is positively correlated with high scores for depression, hysteria and hypochondriasis on the Minnesota Multiphasic Personality Inventory. http://en.wikipedia.org/wiki/Waddell's_signs.

Plaintiff was examined by James Walentynowicz, M.D., of Chesterfield Orthopedics on December 3, 2002, December 10, 2002, and January 7, 2003. On December 3rd, plaintiff reported that she was taking Percocet, Lipitor,[11] Prozac, and Ambien.[12] She presented with complaints of pain on the right side. Sitting for long periods was uncomfortable, as were bending and twisting. Dr. Walentynowicz noted that plaintiff moved her neck guardedly and had limited glenohumeral and lumbosacral range of motion, but no spasm. Straight-leg raising was negative and passive range of motion of the hips was painless. Plaintiff showed no motor weakness. Sensation was intact and there was no evidence of atrophy. Her gait revealed no limp or list, although she walked very deliberately. Dr. Walentynowicz ordered an MRI of her lumbar spine, which was completed on December 6, 2002. The MRI found disc dessication at the L5-S1 level, and a slight central disc protrusion at the L5-S1 level. (Tr. 156).

On December 10th, plaintiff had reduced range of motion (25% to 50%) of the cervical spine with mild tenderness; she had greater range of motion of the lumbar spine (75%). She showed no motor weakness in the lower extremities. Because plaintiff complained of "so much discomfort" in physical therapy, Dr. Walentynowicz recommended a temporary cessation. Dr. Walentynowicz noted that it can take three to four months to recover from disc protrusions,

---

[11]Lipitor is used for the treatment of high cholesterol. See Phys. Desk Ref. 2495-96 (60th ed. 2006).

[12]Ambien is used for the short-term treatment of insomnia. See Phys. Desk Ref. 2867-68 (60th ed. 2006).

which he believed were caused by her accident. He prescribed Naproxen[13] and Darvocet[14] and continued plaintiff's "off work status." (Tr. 153-54).

The record contains a report of plaintiff's visit to the emergency room at St. Joseph Health Center on January 1, 2003. She complained of head and neck pain due to slipped discs in her back. She received Demerol. (Tr. 214-15).

On January 7, 2003, plaintiff reported that she was "no better" despite a month of rest. She complained that the Darvocet and Naproxen were not helping and stated that her primary care physician had prescribed Percocet at her request. Dr. Walentynowicz stated that there was nothing further he could offer from a nonoperative standpoint and recommended a neurosurgical evaluation. He opined that plaintiff's symptomatology appeared to be "far in excess of the disc protrusions noted on her diagnostic testing." (Tr. 152).

Plaintiff was evaluated by neurosurgeon David G. Kennedy, M.D., on January 23, 2003. Her complaints included pain at the base of the cervical spine with radiating pain into the right trapezius area and intermittent pain into the arm and hand; she also reported lower back pain with intermittent radiation into the right leg. Motor examination showed normal gait, tone and bulk

---

[13]Naproxen is the generic name for Naprosyn.

[14]Darvocet is a centrally acting narcotic analgesic agent indicated for relief from mild to moderate pain. It can produce dependence. See Phys. Desk Ref. 3497 (60th ed. 2006).

without atrophy or fasciculations.[15]   She had reduced ranges of motion; straight leg raising caused back pain but no sciatic pain on the right side; straight leg raising on the left side caused no symptoms; she had normal reflexes.   Dr. Kennedy's review of the December 6th MRI indicated no nerve or root compression in the lumbar spine and no canal or root impingement in the cervical spine.   Dr. Kennedy opined that plaintiff's complaints were not radicular.   He referred her for an electromyography and Nerve Conduction Study to exclude root injury.   (Tr. 238-39).

Daniel Phillips, M.D., of the Neurological & Electrodiagnostic Institute, Inc., evaluated plaintiff on January 29, 2003.   Test findings were consistent with rather severe chronic bilateral sensory motor median neuropathies across the carpal tunnels, with the right being more severe than the left.   There was no indication of active cervical or lumbar radiculapathy; indeed, the nerves and muscles in the lower extremities were normal.   (Tr. 232-33).

Plaintiff was evaluated on February 8, 2003, by Sam L. Page, M.D., of Pain Management Services.   Plaintiff reported she had severe neck and back pain, which she described as a shooting, throbbing, aching pain, with a sharp component.   The pain was severe and constant.   She described tingling and numbness in her right arm and leg.   Walking, sitting, standing, driving, moving from sitting to standing, and climbing stairs all made the pain worse.   Lying down and taking pain medication eased the pain.

---

[15]An involuntary contraction, or twitching, of groups of muscle fibers.   <u>Stedman's Med. Dict.</u> 650 (27th ed. 2000).

Physical therapy did not help.  Plaintiff described a history of migraine headaches, depression and anxiety; she reported significant dizziness, insomnia, headaches, numbness in her extremities, and mood swings.  Plaintiff climbed on to the examination table without difficulty.  Upon examination, plaintiff was found to have pain in her neck, back, and right leg upon movement.  Her spine was not tender on palpation; there were distinct trigger points involving the paraspinous muscles on the right side.  Straight leg raising was negative, pinprick sensation was intact, and her upper and lower extremity strength were unimpaired.  The diagnostic impression was myofascial neck and back pain and bilateral carpal tunnel disease.  Dr. Page performed trigger point injections and stated that plaintiff would need additional physical therapy.  (Tr. 184-85).

Plaintiff began a course of physical therapy at Teamwork Rehabilitation, Inc., on February 24, 2003, and continued until April 29, 2003.  (Tr. 166-83).  Progress notes indicate that she appeared for a total of fifteen scheduled visits.  An update prepared after five visits indicated plaintiff had shown good progress with increased trunk and cervical ranges of motion; however, her subjective complaints of pain remained unchanged.  (Tr. 179).  An update following the eighth visit indicates that plaintiff continued to make slow but steady progress with tissue mobility.  Plaintiff reported that she experienced a significant increase in pain after returning to work as a bus monitor on March 11, 2003.  (Tr. 175).

Plaintiff returned to the emergency room at St. Joseph Health Center on March 12, 2003. She complained of headache and back and neck pain, which she rated as a ten on a ten-point scale. The clinical impression was acute muscle tension headache. She was discharged with instructions to follow up with her physician and to return if she had any acute changes. (Tr. 207-12).

Plaintiff's carpal tunnel syndrome was evaluated by R. Evan Crandall, M.D., on March 26, 2003. (Tr. 162-64). Plaintiff reported a history of problems with her hands since 1998, that became worse after October 2002. She said she experienced numbness, tingling, and swelling. It bothered her to write or hold a book. Dr. Crandall reviewed the Nerve Conduction Study completed on January 29th, and stated that surgery was needed for plaintiff to improve. Her carpal tunnel syndrome was not related to bus driving, which Dr. Crandall considered to be a sedentary activity.

Plaintiff returned to Dr. Kennedy for a scheduled office visit on April 1, 2003. She complained of continued pain in the cervical spine and denied that she experienced relief from the trigger point injections. Dr. Kennedy referred her for a myelogram. (Tr. 231).

Plaintiff returned to the emergency room at St. Joseph Health Center on April 4, 2003, complaining of headache and neck and back pain. (Tr. 202-06). Depression was listed as an additional ailment. (Tr. 202, 203). Plaintiff reported that her chest and face felt like they were "caving in." (Tr. 206). Plaintiff informed the staff that when she "gets like this, [she] comes in, gets morphine & goes home. 'I'm usually in & out in 15 min.'" (Tr.

203).  When the treating physician told plaintiff he wished to discuss her request for narcotic medication with her physician, plaintiff said, "Just take everything off & I'll go."  (Tr. 204, 206).  Plaintiff was observed to be able to ambulate quickly and with a steady gait.  (Tr. 206).

Cervical and lumbar myelograms, CTs of the lumbar and cervical spine, and x-rays of the lumbar and cervical spine, were completed on April 9, 2003.  The findings included mild degenerative changes, with no evidence of focal protrusion or neural element encroachment.  (Tr. 258-62).

On April 18, 2003, plaintiff participated in a Functional Capacity Evaluation to determine her capabilities with regard to her position as a bus driver.  (Tr. 240-57).  Although plaintiff was "compliant" and "exerted fair effort," she declined to perform several tasks, citing back pain.  She "displayed inconsistent and submaximal effort during several tests that did not involve her back . . . [and] did not cause any increased pain."  For example, she was unable to complete lifts at any level with ten pounds but was able to exert fifteen pounds of force with static lifts at the same levels.  She "displayed signs of symptom magnification with her reports of constant intense pain, yet displayed no symptoms of physical discomfort, such as sweating, crying, or moaning."  It was concluded that the evaluation did not accurately depict plaintiff's functional capabilities.  Plaintiff perceived herself as crippled on the Oswestry Disability Questionnaire.  (Tr. 241).

During a May 1, 2003, office visit with Dr. Kennedy, plaintiff reported that her symptoms were unchanged. Dr. Kennedy discussed the Functional Capacity Evaluation with her. He noted that, in light of her symptoms, she should be in a job that did not require her to lift more than twenty pounds, or do more than occasional bending, twisting, or stooping. Because she had difficulty rotating, Dr. Kennedy opined that plaintiff should not be a commercial driver, though she could drive her own vehicle at her discretion. He found her to be at maximal medical improvement. (Tr. 230).

Plaintiff sought emergency treatment for migraine headaches at St. Joseph Health Center on June 1, 2003, and June 6, 2003. (Tr. 196-200, 190-94).

On July 13, 2004, David T. Volarich, D.O., conducted an independent medical examination of plaintiff, for which he reviewed medical records submitted by plaintiff's attorney. He also interviewed plaintiff and completed a physical examination. (Tr. 263-73). In addition to the medical records reviewed above, Dr. Volarich reviewed the results of an independent medical examination completed by a Dr. Frumson on June 26, 2003. (Tr. 265). Dr. Frumson's report is not part of the present record.

Dr. Volarich reported that plaintiff underwent a right carpal tunnel release on September 29, 2003, a hysterectomy on October 8, 2003, a right knee arthroscopy on October 17, 2003, and a left carpal tunnel release in January 2004. Plaintiff told Dr. Volarich that she was released from treatment in January 2004. She was not

under active treatment at the time of the evaluation and denied any new or prior injuries to her neck, back, right shoulder, knee, or hand. Id. The reports of these procedures have not been made part of the record.

At the time of Dr. Volarich's evaluation, plaintiff reported that she experienced neck pain that radiated into her mid-back. She also complained of a pain that radiated into her shoulders and of a pinching or catching sensation if she lifted overhead. She had a kink in her low back; the pain radiated into her right thigh. She experienced swelling in her right knee. She suffered headaches every other day. (Tr. 266).

With regard to limitations, plaintiff told Dr. Volarich that she was unable to maintain fixed positions and could stand and walk only for one block. Dr. Volarich noted that, during the examination, plaintiff shifted frequently in her seat. Lifting a jug of milk caused pain. She could not bend, twist, push, pull, run, or jump, but denied all bladder or bowels symptoms. Id.

Plaintiff was able to care for herself but reported that her back "locked" first thing in the morning. She was unable to load the bottom rack of the dishwasher or carry groceries. She limited driving to short distances of under thirty minutes. Id.

On examination, Dr. Volarich noted that plaintiff had symmetric bulk and strength in the upper extremities. Her handgrip and pinch strength were reasonably strong and symmetric. She had asymmetric bulk in the lower extremities, and no deficiencies in strength were noted except in the right quadricep. Plaintiff was

able to walk flat foot without drop, limp or ataxia.[16] She could not toe or heel walk without pain. She could not hop on either foot and could squat only to half of normal. (Tr. 267).

Dr. Volarich found that plaintiff had reached maximum medical improvement. He assessed the following disability ratings attributable to plaintiff's motor vehicle accident:

(1) 10% permanent partial disability of the body as a whole rated at the cervical spine due to cervical strain injury and aggravation of degenerative disc disease and degenerative joint disease;

(2) 12.5% permanent partial disability of the body as a whole rated at the thoracic spine due to strain/sprain injury and aggravation of degenerative disc disease and degenerative joint disease;

(3) 20% permanent partial disability of the body as a whole rated at the lumbosacral spine due to disc bulging as well as degenerative disc disease and degenerative joint disease; and

(4) 30% permanent partial disability of the right lower extremity rated at the knee due to a torn medial meniscus that required arthroscopic repair.

Dr. Volarich opined that the combination of disabilities created a substantially greater disability than the sum of the separate disabilities and that a loading factor should be added. Plaintiff's carpal tunnel syndrome was not considered in connection with the disability rating. (Tr. 271).

Dr. Volarich rated plaintiff as able to perform most of the activities of self care. With regard to plaintiff's ability to work, Dr. Volarich advised that plaintiff limit bending, twisting, lifting, pushing, pulling, carrying, climbing and other similar

---

[16]An inability to coordinate muscle activity during voluntary movement. <u>Stedman's Med. Dict.</u> 161 (27th ed. 2000).

tasks to an "as needed basis."  He recommended that she handle no more than twenty to twenty-five pounds, and refrain from handling weight overhead or away from her body or carrying weight long distances or over uneven terrain.  She should avoid staying in a fixed position for more than 30 to 45 minutes and should change positions frequently, resting when needed.  She should avoid repetitive stooping, squatting, crawling, kneeling, pivoting, climbing and all impact maneuvers.  (Tr. 272-73).

### IV.  The ALJ's Decision

The ALJ made the following findings:

1. Plaintiff met the disability insured status requirements of the Social Security Act at the time of the alleged onset of disability (October 21, 2002), and continued to meet them through December 31, 2007.

2. Plaintiff had not engaged in substantial gainful activity since October 21, 2002.

3. The medical evidence established that plaintiff had myofascial pain syndrome, a history of cervical, thoracic, and lumbar strains, bilateral carpal tunnel syndrome and bilateral release surgeries, and arthroscopic knee surgery.  Plaintiff did not have an impairment or combination of impairments listed in, or medically equivalent to, one listed in Appendix 1, Subpart P, Regulation No. 4.

4. Plaintiff's allegations of symptoms precluding sedentary work were not credible based on inconsistencies in the record as a whole.

5. Plaintiff could not lift more than ten pounds, or stand and/or walk for prolonged periods.  There were no nonexertional limitations.

6. Plaintiff was unable to perform her past relevant work as a school bus driver, waitress, and checker.

7. Plaintiff had the residual functional capacity (RFC) to perform the full range of sedentary work.

8.   Plaintiff was 39 years old, which is defined as a younger individual.

9.   Plaintiff had twelve years of formal education.

10.  In view of plaintiff's age and residual functional capacity, the issue of transferability of work skills was not material.

11.  Considering plaintiff's residual functional capacity, age, education, and work experience, she was not disabled.

12.  Plaintiff was not under a disability at any time relevant to the decision.

(Tr. 22-23).

## V.  Discussion

To be eligible for disability insurance benefits, plaintiff must prove that she is disabled.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must

make specific findings." <u>Nimick v. Secretary of Health and Human</u>
<u>Serv.</u> 887 F.2d 864 (8th Cir. 1989).    The ALJ first determines
whether the claimant is engaged in substantial gainful activity.
If the claimant is so engaged, she is not disabled.    Second, the
ALJ determines whether the claimant has a "severe impairment,"
meaning one which significantly limits her ability to do basic work
activities.    If the claimant's impairment is not severe, she is not
disabled.    Third, the ALJ determines whether the claimant's
impairment meets or is equal to one of the impairments listed in 20
C.F.R. Part 404, Subpart P, Appendix 1.    If the claimant's
impairment is, or equals, one of the listed impairments, she is
disabled under the Act.    Fourth, the ALJ determines whether the
claimant can perform her past relevant work.    If the claimant can,
she is not disabled.    Fifth, if the claimant cannot perform her
past relevant work, the ALJ determines whether she is capable of
performing any other work in the national economy.    If the claimant
is not, she is disabled.    <u>See</u> 20 C.F.R. §§ 404.1520, 416.920
(2002); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987).

### A.    **Standard of Review**

The Court must affirm the Commissioner's decision, "if the
decision is not based on legal error and if there is substantial
evidence in the record as a whole to support the conclusion that
the claimant was not disabled." <u>Long v. Chater</u>, 108 F.3d 185, 187
(8th Cir. 1997).    "Substantial evidence is less than a
preponderance, but enough so that a reasonable mind might find it
adequate to support the conclusion." <u>Estes v. Barnhart</u>, 275 F.3d

722, 724 (8th Cir. 2002) (quoting <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001)).  The Court may not reverse merely because the evidence could support a contrary outcome.  <u>Estes</u>, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. The ALJ's credibility findings;

2. the plaintiff's vocational factors;

3. the medical evidence;

4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5. third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

<u>See</u> <u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision.  <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence.  <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)).

**B.   <u>Plaintiff's Allegations of Error</u>**

Plaintiff's appeal raises the following issues: (1) whether the ALJ properly considered plaintiff's complaints of carpal tunnel syndrome and headaches in making a determination of plaintiff's residual functional capacity; (2) whether the ALJ properly considered plaintiff's subjective complaints under the <u>Polaski</u> standards; and (3) whether the ALJ erred in failing to obtain the testimony of a vocational expert.

**1. The ALJ's assessment of plaintiff's impairments and Residual Functional Capacity finding**

Plaintiff argues that the ALJ failed to consider her headaches and bilateral carpal tunnel syndrome and surgery and thus the residual functional capacity findings are incorrect.

A claimant's residual functional capacity (RFC) is what she can do despite her limitations. § 404.1545. It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of her limitations. <u>Id</u>. The ALJ determined that plaintiff had the residual functional capacity to perform sedentary work. "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files or small tools. Occasional walking and standing may be required. § 404.1567(a).

Plaintiff first contends that the ALJ erred in his consideration of her bilateral carpal tunnel syndrome and bilateral surgery. The parties agree that at Step 2 of the sequential evaluation process the ALJ found the carpal tunnel syndrome with release procedures to be severe as defined in the regulations. Therefore, plaintiff asserts, the ALJ was required to consider manipulative limitations in determining plaintiff's residual functional capacity.

The ALJ determined that plaintiff retained the capacity to perform the full range of sedentary work, including repetitive hand-finger actions. This finding is supported by substantial evidence in the record as a whole. Plaintiff's symptoms attributable to carpal-tunnel syndrome predated the release surgeries, which were completed in September 2003 and January 2004, after which she was released from treatment. In July 2004, when she was evaluated by Dr. Volarich, she reported that she had not sustained any new hand or shoulder injuries. Dr. Volarich's physical examination established that plaintiff had bilateral shoulder and arm strength, "reasonably strong" hand grip and pinch strength, and symmetrical upper extremity bulk. (Tr. 267). Furthermore, plaintiff did not testify that she experienced any pain, numbness, tingling or weakness in her arms, wrists or hands.

Plaintiff contends that the ALJ erred by not obtaining records from Dr. Frumson, who completed an independent medical evaluation on June 26, 2003, and Dr. Schaburg, who performed plaintiff's right knee arthroscopy on October 17, 2003. A social security hearing is

-24-

a nonadversarial proceeding and the ALJ has the duty to fully develop the record. <u>Smith v. Barnhart</u>, 435 F.3d 926, 930 (8th Cir. 2006). That duty extends to cases where, as here, an attorney represents the claimant at the administrative hearing. <u>Snead v. Barnhart</u>, 360 F.3d 834, 838 (8th Cir. 2004). While the ALJ must neutrally develop the facts, the ALJ need not seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped. <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004). The ALJ is permitted to issue a decision without obtaining additional medical evidence so long as the evidence in the record provides a sufficient basis for the ALJ's decision. <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995).

Plaintiff does not explain how Dr. Schaburg's records regarding the arthroscopy procedure on plaintiff's right knee are relevant to her contention that the ALJ improperly failed to consider her carpal tunnel syndrome. Furthermore, plaintiff does not contend that she is disabled as a result of any condition involving her right knee and the Court sees no error in the ALJ's failure to obtain Dr. Schaburg's records.

Dr. Frumson conducted an independent medical evaluation on June 26, 2003, before completion of plaintiff's two carpal tunnel release procedures, hysterectomy, and right knee arthroscopy. Any opinion Dr. Frumson may have expressed regarding the impact of plaintiff's carpal tunnel syndrome on her ability to work was outdated. Thus, the ALJ did not commit reversible error in failing to obtain Dr. Frumson's records.

Plaintiff also argues without elaboration that the ALJ failed to consider the impact of her headaches when completing the Residual Functional Capacity determination. To the extent that plaintiff intends to challenge the ALJ's credibility determinations with respect to this alleged impairment, that argument will be considered below.

The ALJ's RFC determination is supported by substantial evidence in the record as a whole.

### 2. The ALJ's credibility determination

In <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984), the Eighth Circuit articulated five factors for evaluating pain and other subjective complaints: "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; [and] (5) functional restrictions."

The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1218 (8th Cir. 2001). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, the ALJ may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. <u>Polaski</u>, 739 F.2d at 1322. Where an ALJ explicitly considers the <u>Polaski</u> factors but then discredits the plaintiff's complaints for good reason, the decision should be upheld. <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001).

In the present case, plaintiff testified that she suffered from pain in her back from the base of her skull to her tailbone. She described the pain as "pinching" and testified that she was having muscle spasms. She testified that the pain was severe and that she took Ibuprofen, Tylenol, and Advil.

The ALJ noted that "virtually no clinical evidence" corroborated plaintiff's complaints. (Tr. 21). MRIs, CTs, and x-rays showed mild degenerative changes in the spine, with no canal or root impingement. (Tr. 20). Plaintiff's gait remained unaffected, she maintained sensation in her lower limbs, and her strength was mostly intact. None of plaintiff's treating doctors found any abnormality of the spine that required surgical intervention. (Tr. 20). At the time of the hearing, plaintiff took only over-the-counter medications for pain, even though she testified that the prescription medications were effective. Furthermore, significant clinical signs associated with chronic pain were not been present on physical examination. She showed no evidence of muscle atrophy, bowel or bladder dysfunction, severe or persistent muscle spasms, neurological deficits, or inflammatory signs. In addition, plaintiff submitted no evidence of treatment after May 1, 2003. (Tr. 21). The ALJ also found that plaintiff's work record detracted from her allegations of disability.

Plaintiff asserts that the ALJ did not properly consider her complaints of headaches. Plaintiff sought emergency care for headache pain on four occasions between March 12, 2003, and June 6, 2003. She complained of headaches during the course of her follow-

up care following the accident, and to Dr. Page at Pain Management Services. In July 2004, she told Dr. Volarich that she suffered headaches every other day. With the exception of the emergency room treatment, there is no indication that plaintiff sought treatment for headaches. See Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (failure to seek treatment may be inconsistent with disability). Furthermore, plaintiff did not list headaches as a cause of disability in her application; nor did she testify at the hearing that she suffered from headaches.

Plaintiff also contends that the record establishes that she suffered from depression which, when diagnosed by a medical professional, can be objective evidence of pain. Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998). The record indicates only that plaintiff listed Prozac among the medications she took; the record contains no diagnosis of depression.

A review of the ALJ's decision shows that the ALJ thoroughly considered plaintiff's subjective complaints on the basis of the entire record before him and set out inconsistencies detracting from plaintiff's credibility. An ALJ may consider the absence of objective medical evidence supporting the claimed impairment in discounting a claimant's credibility. See Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994); Edwards v. Secretary of Health and Human Serv., 809 F.2d 506, 508 (8th Cir. 1987). The ALJ's credibility determination is supported by substantial evidence in the record as a whole.

### 3.   The ALJ's failure to obtain the testimony of a Vocational Expert

Plaintiff contends that the ALJ was required to obtain the testimony of a vocational expert because the record establishes that she had significant nonexertional impairments.

The Medical-Vocational Guidelines (Guidelines) are a matrix of general findings, established by rule, as to whether work exists in the national economy that a claimant can perform, taking into account age, education, work experience, and RFC.  By comparing individual factors for a particular claimant to the general findings in the Guidelines, the ALJ can determine whether other work exists in the national economy.[17]   See 20 C.F.R. § 404.1520 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

When a claimant suffers only from exertional impairments and the ALJ's findings of RFC, age, education, and previous work experience coincide with the Guidelines, the ALJ may rely exclusively on the Guidelines to determine whether other work exists in the national economy.  20 C.F.R. § 404.1569a(b); see also Heckler v. Campbell, 461 U.S. 458, 468 (1983) (concluding that the use of occupational Guidelines does not violate the Social Security Act and stating that "[t]his type of general factual issue may be

---

[17] The Medical-Vocational Guidelines consist of three tables (for sedentary, light, and medium work) that may be consulted following a determination of RFC.  The tables direct conclusions of disability or nondisability based on a claimant's age, education, and previous work experience.  See 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 201-03 (2000).

resolved as fairly through rulemaking as by introducing the testimony of vocational experts at each disability hearing.").

The Guidelines, however, do not purport to establish jobs that exist in the national economy for claimants who also suffer from nonexertional impairments. <u>See</u> 20 C.F.R. § 404.1569a(c)(2). Plaintiff contends that she suffers from the following nonexertional impairments: pain, headaches, bilateral carpal tunnel syndrome,[18] and depression. The Court has already determined that the ALJ properly discredited these complaints. Thus, the ALJ was not required to consult with a vocational expert. <u>Reynolds v. Chater</u>, 82 F.3d 254, 258-59 (8th Cir. 1996) (ALJ may rely upon vocational guidelines at step 5 where the ALJ properly discredits complaints of nonexertional limitations).

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [#14] is **denied.**

---

[18]Manipulative limitations are defined as nonexertional limitations. 20 C.F.R. § 404.1569a(c)(vi).

A separate judgment in accordance with this order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 21st day of March, 2006.